Case number 20-1062 et al. Oklahoma Gas and Electric Company petitioner versus Federal Energy Regulatory Commission. Mr. Longstreth for the petitioner Oklahoma Gas and Electric Company. Mr. Binette for the petitioner Southwest Power Pole, Inc. Ms. Becella for the respondents. Mr. Lowell for the interveners for the respondents. Mr. Longstreth is now unmuted. Good morning. Morning. Thank you and may it please the court. I'm John Longstreth. I'll be arguing for Oklahoma Gas and Electric, OG&E, and Mr. Binette will be arguing for the co-petitioner Southwest Power Pool, or SPP, which administers the tariff at issue in this case. In this case, have the two of you divided up the issues in any way? Um, I think yes, although obviously I'll be ready to answer questions, but we've decided that Mr. Binette will be primarily responsible for the tariff issues because it's SPP's tariff. You're going to do the, go ahead then. Thank you. Yeah. In this case, thank you. Thank you, Your Honor. In this case, the commission for, and I'm sorry, one other thing, the section 309 remedy issues, which were at the end of our brief, Mr. Binette is going to take the lead on those as well. In this case, the commission first allowed, then refused to allow, SPP to implement a provision of its tariff during a period during which, with the knowledge and participation of all of its stakeholders, including Excel and AEP, SPP was determining the charges due under that tariff. That provision is known as Attachment Z2, and it was a filed rate under the SPP tariff throughout this period with only the charges remaining to be determined. In reliance on that filed rate, OG&E and other utilities, many of whom are intervenors here, spent hundreds of millions of dollars to build transmission facilities to carry wind power to population centers in Oklahoma and other states. As two of the commissioners recognized, and reluctantly going along with the reversal orders here, the commission's position creates a huge windfall to some market participants who take service under the upgrades we built without having to pay for it, and a huge- Can I, I'm sorry to interrupt you, but I wanted to ask you this question, but your sentence caused me to ask it now. In their brief, the responding intervenors, they say it is not a question of whether the funders will receive reimbursement, but when. In other words, they're saying that this case is only about whether payment will be now or over a period of time in the future. Is that correct? We do not believe- In other words, they're saying there is no windfall. It's just, the question is just when. Well, I think the orders are implemented. As the commission seems to be suggesting, we're going to have to pay tens of millions of dollars back with interest to these respondents. It's going to be a windfall when they receive those tens of millions of dollars back. I still don't get the windfall. Where's the windfall? I don't understand the windfall. As I read the Z2, that's what they say here. They say, I didn't read you the rest of the sentence. It says, the reason it's just there's no windfall is because FERC's orders do not preclude such entities from being eligible to receive reimbursement prospectively and continuously until they receive full reimbursement. Is that not accurate? I think there are two answers to that, Your Honor. This is also something, by the way, that the implementation of Z2 is very, very complicated. Would you just stick with this question? Right. Help the panel understand just this question, which is, as I understand it, this is under attachment Z2. They'll be fully reimbursed. There's no guarantee that we will be fully reimbursed. Why not? Because we don't know exactly who is going to take service in the future under this. For example, the lines are fully subscribed now. Z2 allows payment from future customers. It's a very complicated process in which perhaps over the next 30 or 40 years, we'll recover all of it. We don't know that for sure until we see exactly how it's implemented. The one thing we do know for sure is if these orders are affirmed, we will have to pay back all the money that was paid to us for the service provided under this historical period. Z2 is part of the tariff, right? That's correct. Well, then wouldn't it violate the tariff for you not to be fully reimbursed? I'm sorry, I don't want to get too far into this. Obviously, if this decision goes against us, we would like to think that sometime in the future, whenever that is, we'll get all that money back. At this point, I don't think we have any clear knowledge that that will absolutely happen because of the way the tariff works. I guess all I can say is it's a very complicated process that requires the SPP to determine who is going to be using that facility in the future and then do the calculations of the payment. Of course, I think in our case, it's a couple hundred million dollars. Yes, we're entitled to keep collecting until we get it back decades in the future, perhaps, but we have no guarantee that we'll get it back. With interest, right? I think that's an issue that's being disputed between the parties. What about Judge Walker's question? You just keep saying decades, but it took eight years to accumulate this much money. Why would it take a lot longer than eight years to accumulate it again? Because we've only collected a portion of it. We've only collected a portion of it that then has to be allocated in the future. Again, I admit I have not worked out all of the calculations future. All I know is, and this is why the implementation has been delayed at FERC while we're waiting to determine whether we have to pay back the money to start with, is it's going to be an extremely complicated process to figure out exactly how and when we will be able to get that money paid back in the future if we have to pay it back now. Yes, we are hoping that if we have to pay the money back, that will be put in and we'll be able to get some of it back in the future. I just can't tell you as I sit here today that we're guaranteed to get all of that back going forward. Mr. Longstreth, can you help me understand how the upgrade charges are passed along? So FERC says that upgrade costs arise when transmission occurs. So if these upgrade charges had been passed along in the monthly bills, what is the connection between those charges and the transmission in terms of the billing? How do they work together? Okay. Again, this is starting to get into the complexities of the tariff and it may be that Mr. Bonetta is in a better position to talk about exactly how that works out. I think it's important for the terms, right? Because there's a sense in which on the plain meaning an upgrade charge sounds like something different than a transmission rate, right? I mean, the upgrade charges are for reimbursements for infrastructure, whatever infrastructure means, investments. Whereas transmission rates are for the actual transmission of the energy. So I guess I'm trying to understand how those things are connected. No. Well, I mean, this is transmission. So it's just basically a different way to pay for the mechanism for allocating the cost of this transmission that was constructed because we didn't have an identifiable customer base. You have a situation where the wind power is out in our case in Western Oklahoma, the population centers are in Eastern Oklahoma. And what we have to do is sort of build it on spec. And so OG&E is putting the money forward to build this. It's going to be using it, but then there are going to be other customers using it. We don't know who those are until we build it. So attachment Z2 was basically a different mechanism to allow us to collect for the transmission, but it's still transmission. It's transmission, their transmission facilities, their infrastructure, they're put on the grid, just like any other transmission facilities. It's just that because when those transmission facilities were built, we didn't know who the customers were going to be. We had to have this new mechanism, kind of an innovative mechanism, like FERC said it wanted later under order 1000 to make sure that this transmission was built so that the wind power could get carried. That explanation then seems to undercut your argument that 171 doesn't apply to Z2. Well, I hope it doesn't. I don't think it does. I mean, 171 is just not applicable here in our view, because there was no actual data available at the time until they built it in 2016. So I don't understand why the fact that it's transmission or not transmission goes to that issue. What 171 says is that SPP is required to build within, I'm sorry, required to build within one year of the time the actual data is made available. The actual data was made available in 2016. And that's when they build. So we never thought really that there was a 171 problem to start with. And no one else did either. One of the interesting things about this case is no one raised 171 at this time when all the stakeholders were figuring out how to charge for the energy, the transmission service that was being taken during this period that SPP was working out. No one raised their hand and said 171 makes all of this a charade and no one ever is going to get paid for this eight year period that we're working this out. It was only raised after the fact. And to me, that's fairly powerful evidence that as we SPP couldn't figure out how much to charge until they worked out how to implement this new collection system, this new provision. Can I just ask, would Oklahoma Gas have a separate contractual claim against SPP if it doesn't recover? We have. And obviously, this is yes, we do. And as a matter of fact, we have brought a complaint against SPP. Of course, that complaint will probably go away if there's a reversal here, because we'll get the money that we were entitled to under the tariff and under the contract. Yes, we have a separate contractual claim. Yes, Mr. Burnett will tell you they are vigorously opposing that claim in no small part because SPP is a pass-through entity. They collect money and then from the customers and transmit and then give it back. So their view is we could have a claim against them for $20 million. And Mr. Burnett will tell you, how do we pay this? We're a pass-through entity. We'd have to charge market for it somehow. And our view is you should charge the people who use the service. That's what we're here for. I need to take you back to one of your answers to Judge Rowell. I just didn't quite understand what you say. Were you saying when she asked you whether or not 1.7.1 applies here, whether Z2 covered, aren't Z2 charges, you're not arguing that Z2 charges aren't quote, charges for services under the tariff, right? They are, aren't they? Yeah, that is correct. That's correct. So then I don't understand your argument that this isn't covered by 1.7.1. Well, I mean, it's covered by 1.7.1. I'm sorry, you're right. I guess what I meant by applicability is it's not that 1.7.1 doesn't apply to transmission charges, these are transmission charges. We're saying, I guess a better way to have said it, you're right, Your Honor, is the provision is applicable to charges for transmission, but it doesn't act as a bar here. When I say it doesn't apply, it doesn't, it didn't require a waiver here, as SPP said. They said they were doing it as a out of abundance of caution, because in fact, there was no violation of 1.7.1. 1.7.1 requires the payment within a year after the actual data is available. The actual data was not available until 2016. So you're right when we say an applicable. What about the commission? I'm sorry. The commission has interpreted, the commission says that, I'm confused about why you think a waiver wasn't needed. Under 1.1.7.1, the invoices are supposed to be submitted, quote, for the charges, the charges for all services under the tariff during the preceding month, during the preceding month. These were not charges during the preceding month. That's why a waiver was needed. Yeah, I think so, because that provides, you know, FERC, well, I probably should have said that better too, but no, I think that it's two separate paragraphs. So the invoices have to be issued, and the invoices have to be issued, but there's nothing that says those invoices can't be corrected as actual data becomes available later. The time bar is... This isn't that kind of case, is it? This isn't an inadequate data case, is it? Well, I think it's exactly an inadequate data case, because the whole point of this was that FPP did not have the data to know how much to charge for this service. That's what the period of time, and it obviously went on longer than anybody wanted, including us who wasn't getting paid. But that was the whole point. The data wasn't available until 2016. I mean, I think with all due respect, I think the commission kind of confused the issue a little bit by pointing to these invoices and the monthly invoices. The point of that is, yes, we issue, SPP issues the invoices every month, but there's nothing in that invoice procedure that bars SPP from coming and billing later when it has the actual data. That time bar provision that they're really hanging their head on, that's in the separate paragraph, and that separate paragraph makes clear that the one-year bar does not start until the actual... I agree with you about that. I think you're right about that. But the commission is relying on the quote, during the preceding month language. That's their... Yeah, they are. And you have to... This is an interpretation of a tariff, so our deference to the commission in these tariff cases is pretty deep. You need to say that that's an unreasonable interpretation. Well, no, I think we have to say that it violates... Well, I mean, that is one thing we can say. I think what we are also saying very clearly, and we said it very clearly to FERC, and FERC didn't deal with it, is that under the plain meaning of the tariff, the one-year bar... And that's what's really at issue here. What's at issue here is, because FERC let us go back one year. In 2016, they let us go back one year. They said, you can't go back further because of this one-year bar. The problem with FERC reasoning is that the one-year bar doesn't start until actual data is available, and the actual data wasn't available until 2016. We made that argument, FPP made that argument specifically to FERC, and they never dealt with it. If you look at paragraph 21 of the rehearing order, they're talking about something completely different. They never deal with that plain meaning argument. So since they didn't deal with it, you don't have to defer to them. I understand. Unless either of my colleagues has any questions, you're well on time. Thank you very much for making it. Mr. Burnett? Yes. Good morning, Your Honor. I may please the court. Matt Burnett, arguing on behalf of Petitioner Southwest Power Pool D. I'd like to begin with this is really a matter of timing of recovery versus recovery overall. I think the interveners on FERC's side are wrong about this being only an issue of timing for several reasons, one of which is that attachment Z2 does not actually guarantee full 100% recovery. What it guarantees is eligibility to recover from those customers whose subsequent transmission service requests require that line in order to provide that service. And so once that condition is met, the project sponsors are eligible for their reimbursement. However, those reimbursements under attachment Z2 for network transmission service are based on annual revenue requirements of those projects. And so if you have a year, if you have an annual revenue requirement for a certain year, but you don't collect any revenues to fill that revenue requirement, that revenue requirement is essentially gone. So for years where OG&E had a revenue requirement, for example, for their wind speed transmission project, but that project is not receiving any sort of attachment Z2 credit, those revenue requirements are effectively gone. So while there is no guarantee under attachment Z2 that even if we had implemented it on time, OG&E would be 100% compensated, the fact that FERC has essentially removed seven years worth of their eligibility for attachment Z2 credit makes it even much harder for them to be reimbursed, which is exactly what the tariff anticipates and is intended to fill. So really there is harm for OG&E and other project sponsors here because their ability to get attachment Z2 credits and be reimbursed is made much harder. And to get to Judge Rao's question to Mr. Longstrep about charges versus rates, these tariff rates are incredibly complex and they include multiple components. Customers pay for a portion of the transmission order's existing legacy facilities that have been in service for 50 years. They pay for these upgrades that project sponsors like OG&E provide to SPP. They're also paying for projects that are planned by SPP and cost allocated around the region. So to say that these charges are separate from rates, I don't think is a fair characterization. However, and this really speaks to the last issue that Mr. Longstrep was discussing. Okay. Mr. Burnett, if I can just ask you, I guess maybe my question was also, I mean, Z2 talks about revenue credits, right? So are revenue credits also part of service transmission? Because it sounds like something different, you know, just to me not being a FERC expert. Yeah. So the revenue credits are SPP's mechanism to pay these project sponsors back. So a traditional transmission facilities that SPP provides service of, they provide SPP with an annual revenue requirement. And then there's a formula in the tariff that determines how those transmission owners receive a portion of the money SPP takes in. And it's based on various, you know, formulas set forth in the tariff. So for project sponsors like OG&E, the mechanism to compensate them is the revenue credit. But what we collect from the customer is what we credit payment obligation. I don't believe that's a term that's defined in the tariff, but that is a term that we use in our briefs and in our proceedings to FERC below. So we collect those credit payment obligations based on attachment Z2 and based on this complex system that we developed to calculate those. And you agree with Mr. Longstrep that all of that is encompassed in 171's charges for all services furnished under the tariff? Well, those are a component of tariff of transmission service charges. Yes. And so I think that is correct. And so if you read the first sentence of section 1.7.1 in isolation, which is what FERC does in their orders in their briefs, yes, it says that SPP is required to furnish a bill, but it does say four charges for all services. It does not say for all charges or those charges are forever forfeited in order to look for the time limit. That is my question in part, right, is whether these credits are services furnished under the tariff during that month. Yes, the credits pay for service that was provided over OG&E transmission model. But in order to get to the when SPP can no longer recover those that it has a one year time provision and that time provision unambiguously in our view doesn't kick in until after SPP has rendered a bill reflecting the actual data. And as the long portrait history of this case lays out, SPP struggled for years, first to determine how in detail to calculate those charges, and then subsequently had to go through two different software vendors in order to develop the complicated systems to make the chart. The commission relies on an earlier sentence in 1.7.1 during preceding month sentence. Right, and why is that, why is their interpretation of the tariff unreasonable? Their interpretation of the tariff is unreasonable because that sentence is really only talking, that's only really setting up how SPP builds. Wait, it says, wait, no, no, wait, it says, it says, it says, wait, let me get the line here. It says, okay, it says the provider, it says, after the first day of each month, the provider shall submit an invoice to the customer for the charges for all services furnished under the right, all services under the tariff, right? That's Z2. Well, Z2 itself is not a service. I mean, Z2 is a component of freight. I understand that, but they are services, services furnished under the tariff, right? Right, to the extent that, for example, XL took transmission service during a month, and that transmission service required a lot of different facilities to provide. Whatever it is, whatever it is, it has to be billed, it has to be billed, it has to be billed, those charges during the preceding month have to be billed within a reasonable amount of time, right? What needs to be billed is the charges for XL's transmission service, and that provision, and no one's denying that XL received the bill, and I think the issue is, was that bill complete? And that sentence does not talk about the completeness of the bill. All it says is for all services. XL took transmission service. If they took point-to-point service and network service, those would be two different transmission services, but they were both billed in that same bill. But just, I don't want to belabor this. I don't want our expenditures under Z2 for, quote, services furnished under the tariff. And so, XL received a bill for the service. No, I didn't hear your answer. Are they not, quote? Oh, I apologize. Can you hear me better? Now, I got you, yes. Yeah, sorry about that. They are, right? Are they not? Yes, they are. Okay, thank you. And I pick up on, go ahead, but then I have a follow-up question. I was just going to say that I know that I'm over time here, and I did reserve time for rebuttal, but I think that even if the court determines that SPP's interpretation of the tariff is erroneous, I still think that, you know, we do have our arguments regarding notice. I mean, these Let me ask one hypothetical that follows up on Judge Taylor's line of questioning. Take this first sentence from 171 that you've been discussing, and imagine it's a cable bill. Imagine I'm the cable customer, and Comcast, let's say, is the cable company. And the rule is that within a reasonable time after the first day of each month, Comcast shall submit an invoice to the customer for the charges for all services furnished under the tariff during the preceding month. Now, if we just look at that, then I, as a cable customer, have to get my bill for April sometime in May. And now along comes Z2, and you're saying, well, Z2 changes that. Z2 allows Comcast to bill me for some charge that was for a service in April of 2020, and they can bill me in April of 2028. There's something in Z2 that allows that. And, Mike, if that's what you're saying, my question to you is point me to the text in Z2 that allows that. And I appreciate that. It's not actually the text that's in Z2, Your Honor. It's actually the text that's in Section 1.7.1 in the second paragraph, which says that the one-year clock does not begin to run until SPP has rendered the bill reflecting the actual data. Because SPP didn't have that. Okay, so let me read that, because billing adjustments for reasons other than A or B shall be limited to those corrections and adjustments found to be appropriate for such service within one year after the rendition of the bill reflecting the actual data for such service. So which exception do you think that this falls under, A or B? It doesn't fall under either exception, Your Honor. It's the general rule that the bills reflecting actual data were not actually rendered until 2016, because prior to that, SPP lacked the ability to calculate that data. All right, but then that just takes us back to the preceding paragraph, which says you have to submit either actual data or estimated data within a reasonable time after the first day of each month. Correctfully, it does not say that. It says that SPP has to render a bill for the service. It does not say that that bill is final or that that bill necessarily has to reflect, excuse me, each and every charge. That's why we have the actual data language, that if that data is available later, we can include that in the bill. And the second part of the paragraph on section, on the second part of the first paragraph of section 1.7.1 says that invoices may be issued using estimated data. It doesn't say that they have to be issued using estimated data. So, okay, well, no, it says to the, oh, go ahead. No, no, we're well over time. Are you finished? I mean, I don't want to interrupt you. No, I'm good. Thank you. All right. Naomi, you got anything? No, that's fine. Okay, great. All right. We'll hear from the commission. Good morning, Your Honor. I'm hoping you can hear me. Thank you. Good morning. I'm going to start with this actual data language in billing procedure 1.7.1. If you look at the data sentence in the first paragraph of 1.7.1, which says invoices may be issued using estimated data to the extent actual data is not available by the fifth working day of the month following service. And then it says adjustments reflecting the difference in billing between the estimated and actual data will be included on the next regular invoice. Again, following on with the, you have to get this all done within a month. If you have to use estimated data, you can use estimated data, but you have to provide the actual data in the next month. And then the next paragraph, which talks about the one-year time limit, says that billing adjustments for reasons other than those two exceptions that don't apply shall be limited to those corrections and adjustments found to be appropriate for such service within one year after rendition of the bill reflecting the actual data for such service. Actual data there refers back to the short time period after which you replace actual data, the estimated data with actual data, all happening in a very short time period, not a matter of years. So that's what the actual data is talking about here, not actual data you can sit and wait for eight years and come up with actual data and then come back and have these bills be not final this entire time. So I'm hoping that that resolves what actual data is about. In OG&E's reply brief, they've, which is on, they have some block, a block quote on page six, and I wondered if you could, if you could reply to their reply here. They're quoting Canadian Association of Petroleum Producers, which itself is quoting natural gas clearinghouse, and it's two sentences. So long as the parties had adequate notice that surcharges might be imposed in the future, imposition of surcharge does not violate the file-to-rate doctrine. The file-to-rate doctrine simply does not extend to cases in which buyers are on adequate notice that resolution of some adjustment to the rate being collected at the time of service. I suspect that you have a way that you can distinguish that case. I'm sorry, I didn't actually find the quote, but I think I understood what you were talking about, Your Honor. The commission found that there was not actual, there was not adequate notice here to satisfy the file-to-rate doctrine or retroactive rate making requirement. I'm a little bit confused on that too, because on the next two pages of their reply, and maybe I have the page numbers wrong, but I think it's seven and eight that I'm on now. They've got two quotes from your brief that seem to be in some tension. So I'll read the two quotes. One of the quotes is talking about upgrade sponsors, and it says they could not reasonably have expected that their upgrade costs would be reimbursed. So that's what you just said a moment ago. But then it looks like there's also quotes saying customers may have been aware from the stakeholder proceedings and study report negotiations that SPP ultimately intended to implement the crediting procedure retroactively for the historical period. So do you see the tension there and how do you resolve that? No, there is no tension there, Your Honor. And I'm sorry if my brief caused some confusion. No, the commission's point was there can be notice and there can be notice that's adequate to satisfy the file-to-rate doctrine or the rule against retroactive rate making. And so while there might have been notice that that was SPP's intent, SPP's statement, one-sided statement saying that is not sufficient. What this court has found is that matters that are not on file with the commission do not satisfy the notice required for the file-to-rate doctrine. Again, Federal Power Act Section 205D requires that all rates be on file with the commission and any changes to those rates be on file with the commission. I mean, not just rates but rules as well. Yes, Your Honor. So adequate notice means notice provided through some type of filing with FERC? That is one of the ways to do it. There are other ways, none of which applies here as well. If, for example, if there's a judicial proceeding regarding the matter. Or it's a formula. Actual notice is not enough. Actual notice could be enough. It's not necessarily enough, Your Honor. Okay, that's helpful. Can I take you back to the debate we were having about whether this case is just about timing? Yes, Your Honor. Sure, absolutely. What the tariff provision provides, what Z2 provides, if you look at page A11 of the petitioner's brief, the opening brief, the very first sentence says, an upgrade sponsor shall be eligible to receive revenue credits in accordance with Z2. And then the next sentence says, costs are recoverable from new transmission service using the facility as defined until the amount owed the upgrade sponsor is zero. So it's just all about timing, right? It is all about timing. And if there are concerns that because of the way Article Z2 is formulated now, that in the future, upgrade sponsors won't be able to fully recover, which of course they weren't promised that in the first place, but they were just promised eligibility. But if there are problems because of this revenue requirement issue, which I confess, I don't really understand what the issue is, but even if that's true, Z2 has been changed before and Z2 can be changed again. So if it's now based on these revenue requirements that might cause a problem with fuller recovery of the costs, upgrade sponsors paid, Z2 is changed in 2013, I believe it was changed in 2015, it can be changed again to take care of that problem. And I'm sure that the commission would entertain a filing to make a change such as that, as long as the commission found it to be just and reasonable. So can I ask you, are there any differences in treatment under the filed rate doctrine between rate terms and non-rate terms? I mean, it seems to be the commission's position that there is not, but there are some earlier decisions of the commission in old dominion itself, the underlying decision drew the possibility that there could be some distinction between rate and non-rate terms. Is that no longer the position of commission? I would say that as a general matter, I think that's probably true. I'm not saying that there is no non-rate term, the commission, I can't really speak for the commission in that sense, but I think the point is the filed rate and rates include the requirement to have filing with the commission is not limited to rates themselves, but to all of the rules and other things that go along with that, that would not necessarily be considered rates. And so the commission previously was granting waivers as it did in this case, right? Which would allow for a form of retroactive rates to be applied. So the commission's position now is that that is inconsistent with the statute. I think the commission also issued, you're absolutely right, your honor. No question, the commission issued orders in which it addressed justice for waiver considerations without addressing the filed rate doctrine and made mistakes doing so. And the commission has said so in its policy, its proposed policy statement that is mentioned in the petitioner's brief. And what the commission there said is, it's worth hearing. I think the commission says paragraph one of the proposed policy statement at 171 FERC 61156, the commission's waiver orders have sometimes drifted beyond the limits imposed by the filed rate doctrine and rule against rate making. And what the commission is proposed to do now is to, in paragraph 19 of that order, it says it will apply the four part waiver analysis, but only in circumstances where it can determine that the filed rate doctrine and the rule against rate making won't be violated. So my question is, is FERC retroactively applying that new determination here to Oklahoma gas? Because the only reason this went to FERC on remand was in light of Old Dominion, right? This court's decision in Old Dominion. But that decision didn't change the things that you have just discussed FERC changed in its policy statement. So this was opened up on remand, but it doesn't seem that FERC was really addressing anything that happened in Old Dominion. It was just making a policy change or a legal interpretive change about its authority under the filed rate doctrine, which it's now applying in a sense, retroactively to these parties. I don't think that's exactly right, your honor. What the commission was reminded by from Old Dominion coming out. And again, remember Old Dominion affirmed the commission's not to allow a tariff waiver because of the filed rate doctrine. So the commission just was reminded, oh my gosh, we have a situation where we have a protest here. We have somebody bringing us to court. We do not have a defense for this. So it's not a matter. It's literally the commission now complying with what this court's president already has said for a long time. And many of FERC's decisions have said for a long time. Sometimes we just didn't comply with the filed rate doctrine and our orders. And we recognize that now, and we're not going to continue to do that. So are you going to go back and reopen other decisions that were made, granting waivers in similar circumstances? I mean, I guess I'm wondering why these parties have their proceedings reopened in this circumstance. I mean, the commission, of course, is allowed to take a different position and explain itself reasonably. I'm suggesting it doesn't have the authority to do that. But what about applying it to these parties who had already previously received a waiver? Your Honor, that was pending litigation. So this isn't a reopening of the case. The case was still pending in litigation. So there was no finality to the commission's orders yet. The commission had issued what were final orders and asked for it back because the case was still open. So this is in a circumstance where there was no court proceeding. The orders were final. Weren't the orders final with respect to FERC? I mean, there was litigation in this court, but that doesn't make the commission's decision not final, does it? The commission was faced with a circumstance of having to defend indefensible orders is really what it came down to. To grant waiver here without considering filed rate doctrine concerns that were readily apparent and the commission found it indefensible. I mean, that's why the commission brings back its orders because it thinks that something needs to be reconsidered. And the commission does not believe that that decision was made correctly. So this, again, it wasn't final. The order stopped being final once an appeal is made. It's true once we issue an order without asking for the case to come back to the commission, but the orders were no longer final orders in the sense that they could not. The commission couldn't then reconsider its decision with leave of the court and the court granted that leave. Right. It was unopposed by the parties. It was unopposed. Judge Ryan, were you done? Yes, I am. Thank you. Judge Walker, you have anything? I could ask one question. No, go ahead. Yeah. Along, just along those lines, OG&E or the petitioner's reply at page 14 says you're continuing to grant these types of waivers with retroactive application using the four-factor test without mentioning notice or the filed rate doctrine. They say you're continuing to grant those type of waivers as recently as last Friday. Is that true? So this court's precedent in Brooklyn Union Gas, which is, excuse me, Your Honor, 409F3404 Act 406 says that the court does not consider post-record commission orders in determining whether the orders before the court are reasonable. So all those orders, it is true. The commission did issue the orders in those circumstances without considering the filed rate doctrine matters. In each of those cases, there were no protests filed and no hearing requests were filed. But I wouldn't want to have had to defend those cases in court either. And the commission has issued this proposed policy statement, which is still in flux. It hasn't been finalized yet. And I'm speaking completely out of my... I think maybe the commission's waiting. I have no idea, but maybe they're waiting for this decision to come out and get a ruling from the court. Okay. Thank you. We'll hear from Mr. Lowell. May it please the court. My name is Joseph Lowell and I am counsel for Accel Energy Services and speaking today on behalf of the intervenors for respondent. The intervenors for respondent request that the court deny the petition for review of FERC's order. Each of the intervenors on behalf of respondent are transmission service customers within SPP. Each of the intervenors agreed to take transmission service from SPP, entered into service agreements with SPP for the transmission service, and then pursuant to the waiver orders will retroactively build for attachment Z2 credits in violation of section 7.1 of the SPP tariff. To be clear, we interpret 7.1 as prohibiting any cost components of transmission service that should have been included in the bill to be billed beyond one year. These were transmission service charges that SPP was seeking to resettle. Their waiver, original waiver application makes this clear. They discuss reviewing all of the transmission service that occurred back to 2005. They discuss calling back revenues from transmission service that were provided to other transmission owners. So, this was a prohibited resettlement of transmission service charges going back all the way to 2008. A primary issue in this case is the notice issue. SPP and intervenors on behalf of the petitioner side have argued that parties had noticed all along that this was the plan, that there was going to be a resettlement of all the attachments, of all the transmission service charges to include the attachment Z2 component. This is not the case. It was their burden to demonstrate that such notice had been provided to FERC. What they provided is essentially their assertion that this was discussed during the stakeholder process. They have argued, they have pointed to statements that Xcel Energy Services, we have made in our pleadings as a concession that we were aware of. Now, what was really happening was SPP did not know how to assess whether or not entities were using the attachment Z2 creditable upgrade. No one knew that we were taking service over these facilities and should have had to pay for them. The service itself or the way to identify the attachment Z2, the people who should be reimbursed and the people who should pay was determined well after. During the SPP stakeholder process, what was happening was the stakeholders were trying to figure out a way to make the attachment Z2 credits work, to identify the beneficiaries and the parties who should pay. Xcel Energy Services did not understand, and it is true also for the other interveners on behalf of the respondents, that a resettlement going back up to eight years was contemplated as part of that. Xcel Energy Services began to understand that in the second half of 2015, that having figured out how to identify the relevant parties, the parties who should be compensated, that having figured that out through the software and the stakeholder process, the SPP intended to apply that backwards. We did not know ahead of time. It does seem hard to believe, Mr. Lowell, that if you are in a process discussing how these revenue credits are to be allocated over a period of time, that you would not be on some kind of actual notice that you were liable for those costs of which the interveners enjoyed the benefits of that service. I do not know that that is dispositive here, but it does seem hard to imagine that there was no actual notice to the interveners. Attachment Z2 speaks of how for each new transmission service request that would use a creditable upgrade, SPP will determine whether that service could not have been provided but for a creditable upgrade. Now, this task force, the SPP committees, one of which was called the Crediting Process Task Force, was trying to figure out how conceptually they could do that when given the volume of transmission service requests that were coming in. Keeping in mind that transition customers in general pay a rolled-in rate, reflecting all the costs of the transmission system, and what we are trying to do here is isolate whether a new service could not be granted without that isolated facility to sponsor an upgrade. That conceptually is difficult. Any other questions? Thank you. Mr. Longstreth and Mr. Bennett, you were both out of time, but you can each have one minute. Okay. Thank you, Your Honor. I'll try to be very quick. One minute. Ms. Pasella said actual notice may be enough, but it's not always enough. What's not enough? Say it again. Ms. Pasella said that actual notice may be enough, but it's not always enough. Nobody cited any case that people had actual notice that that's not enough. Old Dominion wasn't such a case. That was after the fact. West Deptford wasn't such a case. Here, the obligation was known to everybody. Did they have actual notice? Of course, they had actual notice. Joint Appendix 398, Excel said in its pleading, was fully aware of SPP's intent to implement this retroactively. The working group, he mentioned the working group. We cited this in our brief. January 2014, SPP must collect and pay all credits owed since May 2008. Record 32, page five. We didn't put it in the appendix, but one of the other protesters, there's a graph. 2011, the market group that all these people were part of. What's next? Credits due back to May 2008 when FERC approved the but-for condition. Record 32, page five. Everybody knew. That's why we were there for years. Everybody knew this was going to be collected back to 2008. That was the whole point. There's not a single case that when people have that kind of actual notice, the file break doctrine prevents it from being collected. Mr. Longstreth, you're over time again. Thank you. I'm sorry. Thank you. Mr. Bennett, go ahead. Yes, thank you, your honor. I would just pick up where Mr. Longstreth left off. Ms. Pasella said that actual notice is not available when there are one-sided statements from the RTO. This case does not involve one-side statements. These customers participated in years and years of stakeholder meetings. We have records of their voting to endorse the approach that SPP ultimately took based on the presentations that Mr. Longstreth mentioned. This is not a case of SPP just saying, oh, we're going to bill you. Mr. Bennett, even if we assume that there was actual notice, can you point to a case in which the actual notice did not involve a filed rate with FERC where they took into account that actual notice? It seems to me that the cases that you cite involve notice involving some type of filing with FERC. Some type of filing or some type of agreement. However, none of those cases say those are the only types of notice available. But can you cite a case in which notice was provided without a filing to FERC? Because I was not able to locate one, but perhaps there are some. Not off the top of my head, Your Honor. And if I could just make one more quick point just to sort of pick up on what Judge Walker and Judge Rawert were exploring. FERC prior to SPP's waiver and in fact prior to the Old Dominion waiver had previously granted, or the Old Dominion case rather previously granted waivers of this exact tariff provision. These parties had noticed that FERC viewed it as waivable and FERC continues to this day to grant retroactive waivers. Mr. Bennett, we have that argument. Thank you. Thank you very much. Thank you all the cases submitted.
judges: Tatel, Rao, Walker